JUDGE PAULEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 3583

------------------------------------------------------------

ALEXANDRA CASTILLO,

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

Plaintiff,

Index No. 14-CV-_____

-v-

THE CITY OF NEW YORK, NYPD Officer
JEREMIAH TORRES (in his individual capacity),
NYPD Officer MARIA MORFE (in her individual
capacity), NYPD Officer YUSHIRA ROSARIO (in
her individual capacity),



Defendants.

------------------------------------------------------------x

Plaintiff ALEXANDRA CASTILLO, through her attorney Robert M. Quackenbush of

Rankin & Taylor, PLLC, as and for her complaint in this action, does hereby state and allege:

### PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and

   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

   Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff ALEXANDRA CASTILLO's right to be free from unreasonable searches and

   seizures were violated when officers of the New York City Police Department ("NYPD") –

   defendants JEREMIAH TORRES, MARIA MORFE and YUSHIRA ROSARIO – unlawfully

   arrested Ms. CASTILLO for "acting in a loud manner" as she observed police officers

   arresting her co-workers who themselves were simply observing officers write summonses

   for people who possessed marijuana. Notwithstanding the fact that sworn allegation that Ms.

   CASTILLO was "acting in a loud manner" is completely untrue, it does not constitute a

   violation of any law even if it *were* true.

3. By arresting Ms. CASTILLO without probable cause to believe she had violated any law, and doing so in clear retaliation for her protected speech and conduct of observing officers making arrests, Officers TORRES, MORFE, and ROSARIO violated Ms. CASTILLO's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

4. Accordingly, Ms. CASTILLO seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

5. This action is brought pursuant to 42 U.S.C. § 1983 for violations of the First, Fourth and Fourteenth Amendments to the United States Constitution.

6. This Court has subject matter jurisdiction over federal claims, such as those brought in this action, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4).

7. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Ms. CASTILLO's claims arose in Manhattan's Central Park, within the confines of this judicial district.

8. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

9. Plaintiff ALEXANDRA CASTILLO is, and was at all times relevant to this action, a resident of the County and State of New York.

10. At the time of the incident described below, Ms. CASTILLO was employed as a lifeguard with the New York City Parks Department, assigned to Lasker Pool in Central Park.

11. Prior to August 1, 2011, the date of the incident described below, Ms. CASTILLO had never been arrested.

12. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a

police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

13. Defendant NYPD Officer JEREMIAH TORRES is and was at all times relevant herein an officer, employee and agent of the NYPD, who was and is assigned to the NYPD's Central Park Precinct.

14. Officer TORRES is being sued herein in his individual capacity.

15. Defendant NYPD Officer MARIA MORFE (Shield No. 24287) is and was at all times relevant herein an officer, employee and agent of the NYPD, who was and is assigned to the NYPD's Central Park Precinct.

16. Officer MORFE is being sued herein in her individual capacity.

17. Defendant NYPD Officer YUSHIRA ROSARIO is and was at all times relevant herein an officer, employee and agent of the NYPD, who was and is assigned to the NYPD's Central Park Precinct.

18. Officer ROSARIO is being sued herein in her individual capacity.

19. Both Officer TORRES and Officer ROSARIO were defendants in a civil action arising from these same facts and circumstances set forth in paragraphs "22" through "47" below, having been sued for civil rights violations by John Parker and Ricardo Hanson in the case entitled John Parker, et ano, v. The City of New York, et al., 13-CV-3891 (AT) (RLE) in the United States District Court for the Southern District of New York.

20. At all times relevant herein, Officers TORRES, MORFE and ROSARIO were acting under color of state law in the course and scope of their duties and functions as agents, servants,

employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their respective duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of his duties in the capacity.

21. Officers TORRES, MORFE and ROSARIO's acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Ms. CASTILLO's rights.

## STATEMENT OF FACTS

22. Between approximately 6:15 p.m. and 6:30 p.m. on August 1, 2011, John Parker and Ricardo Hanson finished working their shifts as lifeguards in Central Park's Lasker Pool, and Ms. CASTILLO was scheduled to begin her shift shortly thereafter.

23. Shortly after Ms. CASTILLO, Mr. Parker and Mr. Hanson greeted other off-duty lifeguards and the two groups separated, a female police officer approached the groups and stated that she saw one of the other lifeguards (not Ms. CASTILLO or Mr. Parker or Mr. Hanson) with marijuana.

24. As the officer spoke with certain members of the group (not Ms. CASTILLO or Mr. Parker or Mr. Hanson), several other officers, including the defendants, arrived in the area.

25. Officer TORRES told Mr. Parker to move and to sit down. Mr. Parker verbally protested Officer TORRES' order, and the two engaged in a discussion about the propriety of Officer TORRES' conduct – which included words by Mr. Parker that were critical of Officer TORRES' job performance.

26. In an apparent effort to diffuse the situation, another female officer (upon information and belief, either Officer MORFE or Officer ROSARIO) approached Mr. Parker and asked him

to move to a position about 10 to 15 feet *even further* away. Mr. Parker stepped even further away from the investigation – making him about 25 to 30 feet from the marijuana investigation. After moving further away, Mr. Parker then sat down on an elevated concrete planter and observed the investigation continue to unfold.

27. After a further verbal back-and-forth between Officer TORRES and Mr. Parker, Officer TORRES placed Mr. Parker under arrest and took him to a nearby police vehicle.

28. Officer TORRES then returned to the scene of the arrest and investigation.

29. After witnessing Officer TORRES arrest Mr. Parker, Mr. Hanson and Ms. CASTILLO began to ask questions about the arrest, about a piece of paper the officers had given to them, and about the officers' request for their identifications.

30. In response to the questions, Officer TORRES stated, in sum and substance, that Ms. CASTILLO and Mr. Hanson were asking too many questions and they would sort it out at the police station.

31. Officers MORFE and ROSARIO witnessed the entire interaction, but – despite knowing there was no basis to make additional arrests – they nevertheless went along with Officer TORRES' suggestion and placed Ms. CASTILLO and Mr. Hanson under arrest.

32. Ms. CASTILLO, Mr. Parker and Mr. Hanson were thereafter taken to the NYPD's Central Park Precinct.

33. Officer TORRES issued a criminal court summons to Mr. Parker which charged him with a violation of N.Y. Pen. L. § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic.

34. Officer ROSARIO issued Mr. Hanson a criminal court summons which charged him with a violation of N.Y. Pen. L. § 240.20(2), disorderly conduct by making unreasonable noise.

35. Officer MORFE issued Ms. CASTILLO a criminal court summons which, as with Mr. Hanson, charged Ms. CASTILLO with a violation of N.Y. Pen. L. § 240.20(2), disorderly conduct by making unreasonable noise.

36. Between 9:30 p.m. and 10:00 p.m., Ms. CASTILLO was released from custody.

37. The actions of all of the officer-defendants were in contravention of the consent decree entered into by the NYPD in Black v. Codd, 73-CV-5283 (S.D.N.Y., June 1, 1977) (attached as Exhibit 1).

38. This consent decree was incorporated into the New York Police Department Patrol Guide in 1990, setting forth the NYPD's recognition of this rule explicitly recognizing the rights of onlookers to police actions to observe police action in progress and to ask police officers questions.

39. The consent decree in Black v. Codd states: "It is the policy of the New York City Police Department... that when a person (or persons) is detained, stopped or arrested in public areas[,] a person or persons not involved in the conduct for which the first person is stopped or arrested may remain in the vicinity of the stop or arrest as an onlooker or onlookers, subject to the safety of the person stopped, the third persons, the general public, and officer of the police department, and to provisions of the law..."

40. In support of the disorderly conduct charge against Mr. Hanson, Officer ROSARIO swore to the following on the back of the criminal court summons:

> [At the time and place of the occurrence], the deft. (sic) was observed causing a public inconvenience, annoyance, creating a risk there of (sic) in a public place by acting in a loud manner and unreasonable noise (sic).

41. In support of the disorderly conduct charge against Ms. CASTILLO, Officer MORFE swore to the following on the back of the criminal court summons:

> [At the time and place of the occurrence], the deft. (sic) was observed causing a public inconvenience, annoyance, creating a risk there of (sic) in a public place by acting in a loud manner and unreasonable noise (sic).

42. Officer MORFE and Officer ROSARIO used identical language on the criminal court summons, verbatim, to describe the conduct of Ms. CASTILLO and Mr. Hanson.

43. In addition to those allegations being entirely conclusory and doing nothing except reciting the elements of the statute – devoid of any factual allegations at all – they are also materially false.

44. No one except the police and the off-duty lifeguards were anywhere near the scene of the investigation and arrests – there was no "public inconvenience." Moreover, no reasonably competent officer could conclude Ms. CASTILLO created unreasonable noise by questioning the officers about the arrest of Mr. Parker, the piece of paper they had been given, and the officers' requests for their identifications.

45. Upon review of the allegations against Ms. CASTILLO in the criminal court summonses, the Honorable Abraham Clott dismissed the charge as facially insufficient.

46. Thus, despite Officers MORFE and TORRES having clearly colluded to concoct a version of the events on the criminal court summonses for Ms. CASTILLO and Mr. Hanson, respectively, they were *still* unable to recite facts which constituted a violation of the law.

47. As a result of defendants' actions, Ms. CASTILLO was deprived of her liberty for several hours, was humiliated, and endured emotional distress.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF RIGHTS
## FIRST, FOURTH & FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983
### (*Against Officer MORFE and Officer ROSARIO*)

48. Ms. CASTILLO incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

49. By unreasonably seizing Ms. CASTILLO's person and effects, by arresting her without probable cause, by falsely imprisoning her, by initiating a malicious prosecution against her, by arresting her in retaliation for protected speech, and by failing to intervene to prevent these acts from occurring or continuing, Officers TORRES, MORFE, and ROSARIO violated Ms. CASTILLO's rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution.

50. Officers TORRES, MORFE and ROSARIO's deprivations of Ms. CASTILLO's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM FOR RELIEF
## DEPRIVATION OF RIGHTS
## FIRST, FOURTH & FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983
### (*Against THE CITY OF NEW YORK*)

51. Ms. CASTILLO incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

52. The acts and omissions of Officers TORRES, MORFE and ROSARIO (referred to collectively as "individual defendants") described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence on August 1, 2011 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

53. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

54. The acts complained of were carried out by the individual defendants in their capacities as a police officer pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

55. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include but are not limited to the following unconstitutional practices:

    a. Detaining, arrests and manufacturing evidence against individuals who were arrested while observing arrests taking place in public, in violation of the consent decree Black v. Codd, 73-CV-5283 (JNC) (S.D.N.Y., June 1, 1977);

    b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i. in order to protect other officers; and/or

        ii. in order to chill or obstruct persons from lawfully observing arrests of persons in public;

    c. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct; and

    d. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers.

56. The existence of aforesaid customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

    a. Pedine v. City of New York, 13-CV-1675 (CM) (SN) (S.D.N.Y.) (young professional arrested in retaliation for commenting to her friends, in the presence of two police officer, that "[she] wish[ed] they would stop 'stop-and-frisk'"; plaintiff detained for an hour and issued a criminal court summons which contained perjurious statements about plaintiff blocking vehicular traffic at the time of the incident);

b. <u>Bell v. City of New York</u>, 12-CV-5357 (PAC) (S.D.N.Y.) (police officer arrests man who signaled the middle finger to him on a nearly-deserted sidewalk in the middle of the night; plaintiff detained and issued a criminal court summons which contained perjurious allegations that the sidewalk was crowded with pedestrians who became alarmed and annoyed and that plaintiff told the officers, in front of the crowd, that he hated police);

c. <u>People v. Alicea</u>, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement… To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

d. <u>People v. Arbeedy</u>, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

e. <u>Schoolcraft v. City of New York</u>, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

f. <u>Lotorto v. City of New York</u>, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

g. <u>Long v. City of New York</u>, 09-CV-6099 (AKH) (S.D.N.Y.); <u>People v. Pogan</u>, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for

recklessly using physical force; the plaintiff was engaged in expressive conduct, to wit, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

h. Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

i. Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[1]

j. Colon v. City of New York, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

k. Williams v. City of New York, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

l. Dunlop v. City of New York, 06-CV-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

m. McMillan v. City of New York, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

---

[1]   For a description of this case and settlement, see, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

n.  <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

o.  <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

p.  <u>Dotson v. City of New York</u>, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

q.  <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

r.  <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

s.  <u>Carin v. City of New York</u>, 95-CV-3472 (JFK), 1998 U.S. Dist. LEXIS 1533 (S.D.N.Y.) (bystander arrested while observing the arrest of a street vendor in a public place); and

t.  <u>Kaufman v. City of New York</u>, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

57. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a

strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[2]

b.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, then-NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain.   It's more for convenience."[3]

d.  Regarding the CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[4] When it did, however, then-Commissioner Kelly controlled whether the NYPD pursued the matter and he alone had the authority to impose discipline on the subject officer(s). From 2005 to 2013, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[5] As a result, the percentage of cases where

---

[2]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[3]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[4]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).   *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[5]     Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[6]

58. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence,** are further evidenced, *inter alia*, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[7]

> [...]

> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[8]

---

[6]   Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[7]   Mollen Commission Report, p. 36.

[8]   Mollen Commission Report, pp. 40-41.

b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[9]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[10] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[11]

---

[9]     Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[10]     Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[11]     *Id.*

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, was investigated by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[12]

e. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[13]

---

[12]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[13]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[14]

f.  In early 2010, the CITY settled a civil rights lawsuit wherein Officer Sean Spencer[15] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[16]

g.  Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[17]

59. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, *inter alia*, by the following:

a.  Former New York County District Attorney Robert MORFEnthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

---

[14]   John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[15]   In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[16]   *Id.*

[17]   David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

60. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices was known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, then-Commissioner Kelly.

61. The actions of the individual defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which were implemented by members of the NYPD, of retaliating against persons observing arrests in public and thereafter engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates. They did so with the knowledge and approval of their supervisors, commanders and then-Commissioner Kelly who all: (i) tacitly accepted and encouraged a code of silence wherein police officers refused to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encouraged and, in the absence of video evidence blatantly exposing the officers' perjury, failed to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

62. All of the foregoing acts by the individual defendants deprived Ms. CASTILLO of federally protected rights, including but limited to the constitutional rights enumerated in paragraph "49" above.

63. The CITY knew or should have known that the acts alleged herein would deprive Ms. CASTILLO of her rights guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution.

64. The CITY is directly liable and responsible for the acts of the individual defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

65. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then-Commissioner Kelly, did not take steps to terminate these policies, practices and/or customs, did not discipline individuals who engaged in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

66. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein.

67. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest Ms. CASTILLO in retaliation for observing a police investigation and questioning the officers' conduct.

68. Moreover, pursuant to the aforementioned CITY policies, practices and/or customs, Officer MORFE felt empowered fabricate and swear to a false story to cover up the individual defendants' blatant violations of Ms. CASTILLO's constitutional rights.

69. The injuries to Ms. CASTILLO were a direct and proximate result of the CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers.

70. Upon information and belief, *but for* the CITY's apparent failure to train the individual defendants concerning the lawful scope of their authority, Ms. CASTILLO would not have been arrested and charged with disorderly conduct.

71. The CITY's acts and omissions detailed herein resulted in the injuries and damages set forth above.

## JURY DEMAND

72. Ms. CASTILLO demands a trial by jury in this action on each and every one of her damage claims.

**WHEREFORE**, Ms. CASTILLO demands judgment against the defendants individually and jointly and pray for relief as follows:

a.   That she be compensated for violation of her constitutional rights, pain, and suffering;

b.   That she be awarded punitive damages against the individual defendants;

c.   That she be compensated for attorneys' fees and the costs and disbursements of this action; and

d.    For such other further and different relief as to the Court may seem just and
proper.


Dated:        New York, New York
              May 16, 2014


                                      Respectfully submitted,


                              By:     _Robert M. Quackenbush_
                                      Robert M. Quackenbush
                                      Rankin & Taylor, PLLC
                                      *Attorneys for the Plaintiff*
                                      11 Park Place, Suite 914
                                      New York, New York 10007
                                      t: 212-226-4507
                                      f: 212-658-9480
                                      e: robert@drmtlaw.com

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

RICHARD BLACK; ALAN SALISBURY; WILLIE HAMILTON; :
EDWARD S. RICKARDS, J.R., and JAMES GANOCY; for
themselves and all others similarly situated,       :

                        Plaintiffs,       :

        -against-       :73 Civ. 5283
                         (JMC)
MICHAEL CODD,  individually and as Police
Commissioner of the City of New York; Patrolman       STIPULATION
PAUL A. BERT; Patrolman ROBERT CRUZ; Lieutenant :  AND ORDER
DANIEL DILLON; NEW YORK CITY POLICE DEPARTMENT;
CITY OF NEW YORK,       :

                    Defendants.       :

------------------------------------------------x

        It is stipulated by and between the attorneys for the
parties herein that it is the policy  of the New York City Police
Department and the defendants that when a person (or persons)
is detained, stopped or arrested in public areas, a person or
persons not involved in the conduct for which the first person
is stopped or arrested may remain in the vicinity of the stop
or arrest as an onlooker or onlookers, subject to the safety of
the person stopped, the third persons, the general public, and
officers of the Police Department, and to provisions of law e.g.
P.L. §195.05.  The provisions of this order are intended solely
as a settlement of the above entitled litigation, and do not
constitute an admission that the above policy has been violated
by defendants, or any of them.  In the following provisions, the
term "officer" refers to New York City police officers, agents
of the defendants.

        1.  A person remaining in the vicinity of a stop
           or arrest (herein after an "onlooker") shall
           not be subject to arrest for violation of Penal
           Law §195.05 unless the officer has probable cause
           to believe a violation of Section 195.05 exists.

2. None of the following constitutes probable cause for arrest or detention of an onlooker unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated:

(a)  Speech alone, even though crude and vulgar

(b)  Requesting and making notes of shield numbers or names of officers;

(c)  Taking photographs;

(d)  Remaining in the vicinity of the stop or arrest.

3. Whenever an onlooker is arrested or taken into custody, the arresting officer shall report the action to the supervisor at the station house or other place where the person is taken.  Section 110-2 and 110-7 of the Patrol Guide of the New York City Police Department (copies attached), shall be complied with.

4. Defendants shall notify all officers and other employees of the Police Department of the terms of this stipulation by appropriate department order within 60 days of the entry of this order.  Such order shall embody the terms of paragraphs 1 through 3 of this order.  Area commanders will be informed that the basis for the said departmental order is the settlement of this litigation and that the terms of this order are part of the departmental order.  Area commanders shall inform precinct commanders of  the existence of this order

2

5.  Costs, disbursements and attorneys' fees are

waived by all parties and their attorneys.

The above provisions of this order shall and the same

hereby do constitute the final judgment of this court upon the

controversy between defendants, plaintiffs and the plaintiff

class.  In all other respects, the claims of the plaintiffs are

dismissed with prejudice.


Dated:  New York, New York
        6/11          1977


PAUL G. CHEVIGNY
ALAN H. LEVINE
Attorneys for Plaintiffs


W. BERNARD RICHLAND
By:
ASST CORPORATION COUNSEL
     Attorney for Defendants



SO ORDERED: 6/1/77

U.S.D.J.